Argued and submitted September 2, reversed and remanded for reconsideration November 24, 2010

The ATHLETIC CLUB OF BEND, INC.,
*Petitioner,*

*v.*

CITY OF BEND,
*Respondent,*

*and*

MOUNT BACHELOR CENTER, LLC,
*Intervenor-Respondent below.*

Land Use Board of Appeals
2010018; A145997

243 P3d 824

Aaron J. Noteboom argued the cause for petitioner. With him on the brief were Michael M. Reeder and Arnold Gallagher Percell Roberts & Potter, P.C.

Gary Firestone filed the brief for respondent City of Bend.

Sharon R. Smith waived appearance for intervenor-respondent Mount Bachelor Center, LLC.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

ARMSTRONG, J.

**ARMSTRONG, J.**

Petitioner, The Athletic Club of Bend, Inc. (athletic club), applied to the City of Bend for site plan approval for a new driveway and associated public roadway improvements on and adjacent to a parcel of land in a subdivision. A hearings officer denied petitioner's application after concluding (1) that the current version of the Bend Development Code (BDC) applied to the off-site components of petitioner's proposed project and (2) that petitioner's site plan failed to meet the roadway access requirements of that code. Petitioner appealed that decision to the Land Use Board of Appeals (LUBA), which issued an order affirming it. Petitioner seeks judicial review of LUBA's order and raises four assignments of error. Petitioner first asserts that LUBA erred because, under ORS 92.040(2), the proposed project should have been evaluated under the version of the BDC in effect in 1999, as petitioner requested. As explained below, we agree with petitioner and, accordingly, reverse LUBA's order and remand for reconsideration. Because that conclusion is dispositive, we do not address petitioner's other assignments of error.

The pertinent facts are undisputed, and we take them from LUBA's order and the record. The Mount Bachelor Village subdivision (MBV subdivision) is a 22-lot subdivision within the larger Mount Bachelor Village Resort in Bend. The subject property, a 1.01-acre parcel owned by petitioner, is one of the lots in the MBV subdivision. The property is currently developed as a parking lot that primarily serves the athletic club, which is located on a neighboring lot. The property abuts Century Drive along its western boundary and is otherwise bounded by adjacent MBV subdivision lots. Currently, the only vehicular access to the property is provided by an easement over an adjoining lot that allows access to Athletic Club Drive, a private road owned by the athletic club. Athletic Club Drive is a horseshoe-shaped road that connects with Reed Market Road to the north and Mount Bachelor Drive to the east. Reed Market Road connects with Century Drive a short distance north of the property.

The application to create the MBV subdivision was submitted to the City of Bend in September 1999 and approved in December 2000. In 1999, Century Drive was

owned by the Oregon Department of Transportation (ODOT). It appears that the version of the BDC that was in effect at that time (the old BDC) did not regulate driveway access onto city streets. Sometime thereafter, ODOT transferred its interest in the portion of Century Drive next to the Mount Bachelor Village Resort to the city. Subsequently, the city amended the BDC in 2006 (the new BDC), and the new BDC regulates driveway access onto minor arterials such as Century Drive.

In May 2009, petitioner submitted a site plan review application to the city seeking approval to construct a driveway on the property that would allow access to Century Drive. The proposed construction of the driveway would create improvements on the property and also within the adjacent Century Drive right-of-way. Specifically, the proposed project includes a raised center median between the northbound and southbound lanes of Century Drive that would provide a refuge lane to allow access to the property from the southbound lane of Century Drive but would otherwise permit vehicles to enter and leave the property only by using the northbound lane of Century Drive. Thus, the proposed driveway includes improvements on both the property and the Century Drive right-of-way.

Invoking ORS 92.040(2), petitioner requested in its site plan review application that the entire proposed project be evaluated under the old BDC—the local land use regulations in effect when the MBV subdivision application was filed—instead of the new BDC. ORS 92.040(2) provides that,

"when a local government makes a decision on a land use application for a subdivision inside an urban growth boundary, only those local government laws implemented under an acknowledged comprehensive plan that are in effect at the time of application shall govern subsequent construction on the property unless the applicant elects otherwise."

Noting that petitioner "is proposing a driveway both on the subject property and off the subject property, within [the] Century Drive right-of-way," the hearings officer first considered "what constitutes 'subsequent construction on the property' within the meaning of [ORS 92.040(2)]." After

reviewing the text of the statute and the legislative history provided by petitioner, the hearings officer opined that

"the plain language of the statute * * * refers to subsequent construction *on the property*. While I cannot say that the legislative history provided by the applicant is determinative of the issue, this reading is at least not inconsistent with it and is in fact, to some extent, supported by it. The small amount of testimony contained therein refers to building on lots and changes to regulations and standards on individual lots, which the Century Drive arterial street is not."

(Emphasis in original.) In light of that understanding, the hearings officer concluded that, under ORS 92.040(2), the old BDC applied only to petitioner's proposed improvements *on* the property, whereas the new BDC applied to the project's off-property public improvements. The hearings officer found that petitioner's proposed on-site improvements met the requirements of the old BDC; however, he ultimately denied petitioner's application after concluding that the proposal did not comply with the requirements governing driveway access to city streets under the new BDC. Petitioner appealed that decision to LUBA.

On appeal, LUBA "agree[d] with the hearings officer's understanding of the text and legislative history" of ORS 92.040(2). Accordingly, LUBA issued an order concluding, in part, that "[t]he hearings officer did not err by applying the [n]ew BDC access standards to petitioner's application." Petitioner timely sought judicial review of LUBA's order.

To resolve petitioner's first assignment of error, we must determine the meaning of ORS 92.040(2). ORS 92.040 provides:

"(1)  Before a plat of any subdivision or partition subject to review under ORS 92.044 may be made and recorded, the person proposing the subdivision or partition or authorized agent or representative of the person shall make an application in writing to the county or city having jurisdiction under ORS 92.042 for approval of the proposed subdivision or partition in accordance with procedures established by the applicable ordinance or regulation adopted

under ORS 92.044. Each such application shall be accompanied by a tentative plan showing the general design of the proposed subdivision or partition. No plat for any proposed subdivision or partition may be considered for approval by a city or county until the tentative plan for the proposed subdivision or partition has been approved by the city or county. Approval of the tentative plan shall not constitute final acceptance of the plat of the proposed subdivision or partition for recording. However, approval by a city or county of such tentative plan shall be binding upon the city or county for the purposes of the preparation of the subdivision or partition plat, and the city or county may require only such changes in the subdivision or partition plat as are necessary for compliance with the terms of its approval of the tentative plan for the proposed subdivision or partition.

"(2)   After September 9, 1995, when a local government makes a decision on a land use application for a subdivision inside an urban growth boundary, only those local government laws implemented under an acknowledged comprehensive plan that are in effect at the time of application shall govern subsequent construction on the property unless the applicant elects otherwise.

"(3)   A local government may establish a time period during which decisions on land use applications under subsection (2) of this section apply. However, in no event shall the time period exceed 10 years, whether or not a time period is established by the local government."

Subsection (1) of ORS 92.040 imposes a two-step process for subdivision approvals. Under the first step, the subdivision applicant must submit a tentative plan "showing the general design of the proposed subdivision" and have it approved by the appropriate local government. Second, the applicant must obtain approval of the final subdivision plat. However, the local government is bound by the terms of its approval of the tentative plan and cannot impose additional requirements that the applicant must meet to obtain approval of the final subdivision plat beyond those encompassed by the approved tentative plan.

In 1995, the legislature added subsections (2) and (3) to ORS 92.040 because, as LUBA noted in its order,

"some local governments were adopting and applying additional restrictions on construction within subdivisions after the final plat was recorded, taking the position that the shield from subsequent local laws provided by ORS 92.040(1) did not apply to *construction* after the final plat was approved. The legislative history indicates that ORS 92.040(2) was enacted to stop that local government practice."

(Emphasis in original.) Several representatives from the land development industry testified at legislative hearings on the 1995 amendments to ORS 92.040. They provided examples of local government laws, which had been adopted after the approval of subdivisions, that were said to have effectively prevented subsequent development on subdivision lots because the new laws changed the assumptions underlying the creation of the subdivisions. *See* Tape Recording, House Committee on Natural Resources, Subcommittee on Energy and Environment, HB 2658, Mar 8, 1995, Tape 25, Side A, Tape 26, Side A (statements of Jon Chandler, Ernie Platt, Jerry Reeves, and William Cox).[1] The following excerpts from that testimony—explaining the circumstances that precipitated the amendments to ORS 92.040 and the understanding that the industry representatives had of the intended purpose of the amendments—are particularly informative.

For example, Jon Chandler, then general counsel for the Home Builders Association of Metropolitan Portland, was actively involved in drafting the amendments to ORS 92.040 and provided the following written testimony explaining their purpose:

---

[1] House Bill 2658 was the original bill enacted in 1995 to amend ORS 92.040. Promptly after the bill passed both the House and Senate, the proponents of HB 2658 realized that it would prevent land developers from taking advantage of local government laws that were adopted after subdivision approval that were *more* favorable to development. Tape Recording, Conference Committee on SB 245, May 31, 1995, Tape 1, Side A (statement of Jon Chandler). Consequently, SB 245 was enacted shortly thereafter, in part, to allow land developers seeking approval to construct improvements on land in a subdivision to choose between application of the local government laws in effect at the time of the subdivision application or later-enacted local government laws. *See id.*; Or Laws 1995, ch 812, § 9. Those changes to ORS 92.040(2) do not affect our analysis of the meaning of the phrase "subsequent construction on the property," which was not altered by SB 245.

"[House Bill] 2658[A] addresses a loophole in Oregon's protective program. Some jurisdictions have taken the position that the 'safe harbor' [provided by ORS 92.040(1)] only applies to the act of subdividing itself; in other words, building on the lots created by the subdivision is, in these jurisdictions, fair game for new rules and new regulations. We do not believe that this was the intention of the legislature, particularly since applying new rules and regulations to individual lots can dramatically affect the subdivision plan itself.

"HB 2658[A] makes it clear that *all phases of construction are protected from mid-stream local government rule changes, not just the act of subdividing or partitioning*. The bill, as amended, only applies to land inside of urban growth boundaries, and provides that the protection afforded by the bill only lasts for ten years."

Testimony, Senate Committee on Water and Land Use, HB 2658A, May 18, 1995, Ex H (statement of Jon Chandler) (emphasis added). Chandler also explained in testimony at a House hearing on the bill that the protection to be provided by the statutory amendments was necessary because,

"[i]f you know at the front end when you're making the subdivision application what the rules are in total, then you can adjust your lots to accommodate those rules and the configuration can change. It's what comes along later that creates a substantial problem because its already platted, in some cases some building has occurred, and now you're faced with losing lots potentially or at least certainly changing the underlying assumptions."

Tape Recording, House Committee on Natural Resources, Subcommittee on Energy and Environment, HB 2658, Mar 8, 1995, Tape 25, Side A (statement of Jon Chandler). Chandler testified that the regulatory certainty that the bill would provide for land developers was important because, "as urban growth increases and we start looking at greater densities and different building patterns, that certainty is going to become ever more critical for our industry, and, if there are loopholes, we think that they ought to be tightened up." *Id.*

Additional testimony in support of the amendments to ORS 92.040 was provided by Jerry Reeves. Reeves highlighted his frustration with the City of Portland in getting approval to develop a planned unit development that he had purchased as an approved subdivision. According to the subdivision approval granted by Portland, later-adopted environmental approval criteria would not apply to the subdivision because the applicant "ha[d] a right to proceed under the criteria that were applicable at the time the application was submitted." Testimony, House Committee on Natural Resources, Subcommittee on Energy and Environment, HB 2658, Mar 8, 1995, Ex B. Reeves testified that "we based our purchase of the property on * * * the fact that we were going to be out of these new rules or regulations." Tape Recording, House Committee on Natural Resources, Subcommittee on Energy and Environment, HB 2658, Mar 8, 1995, Tape 25, Side A (statement of Jerry Reeves). According to Reeves, however, Portland nonetheless decided to apply its new environmental approval criteria to the proposed development, and, consequently, the project had been on hold for two and one-half years resulting in "millions of dollars" being "tied up." *Id.* Reeves expressed hope that the amendments to ORS 92.040 "will help solve these kinds of problems." *Id.*

As the legislative history indicates, land developers sought the enactment of subsection (2) of ORS 92.040 in order to ensure that the local government laws on which subdivision applications were predicated would be applied to subsequent development on subdivision lots unless developers elected otherwise. Accordingly, subsection (2) now allows applicants who request approval to develop a subdivision lot to choose to apply to all subsequent construction on the lot the local government laws in effect at the time that the subdivision application was made, provided that those laws were implemented under an acknowledged comprehensive plan. However, the protection provided to developers by subsection (2) may not exceed a period of 10 years, and local governments can shorten the duration of that protection if they choose to do so. ORS 92.040(3).

With that understanding in mind, our task reduces to answering the following question: Did the legislature

intend for ORS 92.040(2) to apply whenever the approval of on-property development depends on the approval of off-property construction on rights-of-way and roadways adjacent to subdivision lots that occurs as a consequence of on-property development? We conclude that the answer is, "Yes."

The proponents of the 1995 amendments to ORS 92.040, and Chandler in particular, played an active role in drafting the amendments and informing the legislature of their intended purpose. Our review of the legislative history has not revealed any indication that the legislature intended to achieve something different or less protective from that sought by the amendment's proponents. Accordingly, we conclude that the proponents' testimony about the amendments to ORS 92.040 is a persuasive indication of the legislature's intent in adopting the amendments. That testimony demonstrates that, to provide regulatory certainty to land developers, the amendments were intended to allow construction on subdivided property within urban growth boundaries to be approved or denied based on the local laws implemented under an acknowledged comprehensive plan that were in effect when the subdivision application was made.

However, under the hearings officer's interpretation of ORS 92.040(2), with which LUBA agreed, that legislative intent is frustrated because not all "subsequent construction on the property" is protected by the statute. Rather, only those proposed subdivision development projects that have no necessary off-site components are protected against the application of later-enacted local laws implemented under an acknowledged comprehensive plan. For projects such as petitioner's, in which the approval of proposed on-site development depends on corresponding improvements to adjacent off-site rights-of-way and roadways, the interpretation adopted by LUBA effectively nullifies the protection provided by subsection (2) for on-site development.

Furthermore, as petitioner notes, LUBA's understanding of the statute is problematic "because subdivisions necessarily rely on or create roads and road rights-of-way adjacent to lots, and on-site development necessarily requires the development of the right-of-way between the

road and lot line." Consequently, application of new local government access requirements applicable to off-site construction on adjacent roadways and rights-of-way can, as they did here, effectively prevent a proposed on-site development project that meets the local requirements in effect when the subdivision application was made. In other words, under the interpretation approved by LUBA, new local government laws implemented under an acknowledged comprehensive plan can determine whether on-site development of a previously approved subdivision lot ultimately comes to fruition.

Generally speaking, development of subdivision lots is approved through a land use application—such as a site plan review—that is separate from the application to subdivide. Thus, development of subdivision lots requires application of "local government laws implemented under an acknowledged comprehensive plan," such as the local development codes that the city applied to petitioner's site plan review application. As we understand the process of site plan review for development of a subdivision lot, it is not uncommon for the request for approval of proposed development on the subdivision lot to involve off-site improvements to the adjacent right-of-way in order to provide access to the lot. In fact, sometimes local governments will require roadway improvements as a condition of approval for a site plan review application to develop a subdivision lot.

■   In this case, Bend's new policy about the preferential use of and access to roads—which is part of the new BDC implementing the city's acknowledged comprehensive plan and, thus, potentially subject to ORS 92.040(2)—ultimately determined whether and where construction providing roadway access to petitioner's subdivision lot could occur. What is at issue is whether that new policy can properly be applied here as a standard for site plan approval due to the off-property roadway improvements of petitioner's proposed project when petitioner elected under ORS 92.040(2) to have the project determined under the old BDC. In light of the legislative history and our understanding of how the development of access to subdivision lots occurs, we conclude that the protection that ORS 92.040(2) provides to "subsequent construction on the property" is most plausibly understood to apply whenever the approval of on-property development depends

on the approval of off-property construction on rights-of-way and roadways adjacent to subdivision lots that occurs as a consequence of on-property development.[2] Accordingly, we conclude that LUBA erred in affirming the hearings officer's decision to apply the new BDC access standards to petitioner's site review plan application.

Reversed and remanded for reconsideration.

---

[2] We do not understand ORS 92.040(2) to prevent local governments from applying local government laws that are *not* "implemented under an acknowledged comprehensive plan" to proposed construction projects on subdivision lots and adjacent roadways and rights-of-way, such as laws bearing on the safe design or construction of roads. Concomitantly, we note that the hearings officer's denial of petitioner's application was not based on whether Century Drive could permissibly be reconstructed, but, rather, was based on the city's new development code that implemented a policy preference for the types of roadways to which property should have access.